620 F.2d 672
 22 Fair Empl.Prac.Cas. 1107,
23 Empl. Prac. Dec. P 30,893, 1 A.D. Cases 168
 Paul D. CARMI, Appellant,
v.
METROPOLITAN ST. LOUIS SEWER DISTRICT, a Municipal
Corporation; Lawrence J. Banes; Richard A. Meyer; Henry W.
Lee, Jr.; Phelim O'Toole, Individually and in official
capacity as members of Board of Trustees of Metropolitan St.
Louis Sewer District; Peter F. Mattei, Exec. Director; Mary
Hayslett, Personnel Officer, Individually and in official
capacities, Appellees.
 No. 79-1325.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 6, 1979.
Decided May 6, 1980.
Rehearing and Rehearing En Banc Denied May 29, 1980.
 
 James W. Sherby, St. Louis, Mo., argued for appellant; Stuart R. Berkowitz, Legal Services of Eastern Missouri, St. Louis, Mo., on brief.
 Donald J. Stohr, Thompson & Mitchell, St. Louis, Mo., argued for appellees; Michael H. Wetmore and Robert G. Olson, St. Louis, Mo., on brief.
 Before LAY, Chief Judge,* and BRIGHT and McMILLIAN, Circuit Judges.
 LAY, Chief Judge.
 
 
 1
 Paul D. Carmi appeals the denial of injunctive, declaratory and monetary relief for alleged discrimination in employment on the basis of handicap in violation of 29 U.S.C. § 794 (§ 504 of the Rehabilitation Act of 1973), 42 U.S.C. §§ 1983, 1985(3), and the equal protection and due process clauses of the fourteenth amendment.
 
 
 2
 Paul Carmi has a rare, hereditary, physical disability known as Progressive Peroneal Atrophy or Charcot-Marie-Tooth Disease. This condition results in deterioration of the muscles and nerves of the hands and feet.
 
 
 3
 On April 1, 1976, Carmi applied for employment with Metropolitan Sewer District (MSD), a municipal corporation and political subdivision of the State of Missouri. Following a series of interviews, he was chosen as the preferred applicant for the job of storekeeper at MSD's Bissel Treatment Plant.[1] As the last step in the hiring process, he was required to submit to a pre-employment physical, and referred to the Sutter Clinic for that purpose.[2] He was briefly examined by Dr. Vernon Balster, an employee of the Sutter Clinic. Upon observation of the degree of muscle deterioration in Carmi's hands and feet, Dr. Balster determined that Carmi was not capable of regularly lifting 60 pounds or safely driving a fork lift, and concluded Carmi would be unable to successfully perform the duties of a storekeeper. His recommendation that Carmi not be hired was followed by MSD. Carmi's employment application was kept on file, and he was subsequently considered for one other position which was awarded to a more experienced man. Since June 1978, Carmi has been employed as a parts clerk with the Gusdorf Corporation.
 
 
 4
 The district court held that Carmi failed to prove he was an "otherwise qualified" handicapped individual as required by 29 U.S.C. § 794, or that his constitutional rights had been violated, and that he had therefore failed to establish a claim under 42 U.S.C. §§ 1983 and 1985(3).
 
 
 5
 I. Rehabilitation Act.
 
 
 6
 The initial question before us is whether Carmi has standing to bring an action under 29 U.S.C. § 794 for discrimination in employment.
 
 29 U.S.C. § 794 provides in part:
 
 7
 No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . . (emphasis added).
 
 
 8
 Section 794a(a)(2), makes available to persons aggrieved under section 794 the rights, remedies and procedures of title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, et seq.[3] Section 2000d provides:
 
 
 9
 No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.
 
 
 10
 This provision is limited by § 2000d-3 which states:
 
 
 11
 Nothing contained in this subchapter shall be construed to authorize action under this subchapter by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment.
 
 
 12
 It is true section 2000d-3 expressly limits only agency enforcement to situations where a primary objective of the federal financial assistance is to provide employment. Nevertheless, the legislative history of title VI lends strong support to our conclusion that Congress did not intend to extend protection under title VI to any person other than an intended beneficiary of federal financial assistance.[4] Thus, in suits charging employment discrimination under title VI, one of the purposes of the federal financial assistance must be to provide employment. Since section 794 was modeled after, and intended to be enforced in the same manner as title VI,[5] the limitations on private judicial enforcement of title VI apply to private suits brought under section 794.[6] The Fourth Circuit reached the same conclusion in Trageser v. Libbie Rehabilitation Center, Inc., 590 F.2d 87, 89 (4th Cir. 1978), cert. denied, 442 U.S. 947, 99 S.Ct. 2895, 61 L.Ed.2d 318 (1979).
 
 
 13
 The district court found that the federal financial assistance MSD received during 1976, was in the form of construction and engineering grants for the Lemay Treatment Plant from the Environmental Protection Agency. Since Carmi was not an intended beneficiary of the federal assistance, he lacks standing to bring suit under section 794.[7]
 
 
 14
 II. Constitutional Claims.
 
 
 15
 We agree with the district court's finding that Carmi does not have a liberty or property interest sufficient to invoke the protections of the due process clause.
 
 
 16
 Property interests encompassed by the due process clause of the fourteenth amendment are not created by the Constitution, but by rules or understandings stemming from an independent source sufficient to support a claim of entitlement to the benefit. See Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); Perry v. Sindermann, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972). Carmi relies upon no statutory entitlement to employment with MSD, and, although his expectation of employment was somewhat encouraged by MSD, he does not allege the existence of a binding understanding. His interest in employment, therefore, did not rise to the level of a constitutionally protected property interest. See Board of Regents v. Roth, 408 U.S. at 577, 92 S.Ct. at 2709; Coleman v. Darden, 595 F.2d 533, 538 (10th Cir.), cert. denied, --- U.S. ----, 100 S.Ct. 267, 62 L.Ed.2d 184 (1979); Thompson v. Link, 386 F.Supp. 897, 899 (E.D.Mo.1974). Carmi does not claim any infringement of a liberty interest such as reputation or free speech, nor impairment of his ability to obtain another job. We conclude that Carmi has no interest necessitating due process protection.[8]
 
 
 17
 We do not agree with Carmi that MSD's reliance on Sutter Clinic recommendations is arbitrary and capricious so as to violate his right to equal protection. The classification of prospective employees into those who pass the physical examination and those who do not, is rationally related to MSD's asserted goal of insuring the employment of individuals who can perform their jobs without endangering themselves or others.[9]
 
 
 18
 Carmi does not challenge the district court's finding, supported by the evidence, that all prospective employees are required to submit to a pre-employment physical.[10] The record indicates that job applicants are individually examined by physicians who are experienced in giving such physical examinations and treating occupational injuries and diseases.
 
 
 19
 Dr. Balster testified his recommendation that Carmi could not perform the responsibilities of storekeeper was based upon his knowledge of the general duties of a storekeeper, including the lifting and moving of very heavy objects, his observation of the degree of muscle deterioration in Carmi's hands and feet, and his knowledge of the significance of that degree of deterioration. We note that Dr. Balster has had 17 years of experience in the field of industrial medicine. While we express some reservation regarding the thoroughness of Dr. Balster's examination of Carmi, we cannot say his opinion was rendered arbitrarily. Under these circumstances, MSD's reliance upon his evaluation was not arbitrary and capricious, and its classification of those who pass the examination and those who do not is not "patently arbitrary." Frontiero v. Richardson, 411 U.S. 677, 683, 93 S.Ct. 1764, 1768, 36 L.Ed.2d 583 (1973).
 
 
 20
 Because Carmi has not established a violation of any federal statutory or constitutional right, he has failed to establish a claim under 42 U.S.C. §§ 1983 and 1985(3).
 
 
 21
 The judgment of the district court is affirmed.
 
 
 22
 McMILLIAN, Circuit Judge, concurring.
 
 
 23
 I join in Judge Lay's opinion except part I. I do not think we need to address the difficult issue of whether §§ 504 and 505 of the Rehabilitation Act,[1] 29 U.S.C. §§ 794, 794a(a)(2) cover employment practices of recipients of federal grants. The district court determined that appellant was not an "otherwise qualified handicapped individual" who suffered discrimination "solely by reason of his handicap," 29 U.S.C. § 794, and in my view that finding was not clearly erroneous. Therefore appellant cannot prevail even if the Act is applicable to discrimination in employment by recipients of federal grants. See Southeastern Community College v. Davis, 442 U.S. 397, 404-405 n.5, 99 S.Ct. 2361, 2366 n.5, 60 L.Ed.2d 980 (1979).
 
 
 24
 In view of the majority's approach, however, I must express some reservations about the holding in part I of the majority opinion. Guaranteeing equal opportunity is one of the express purposes of the Rehabilitation Act. 29 U.S.C. § 701 (1978).[2] The statute is a remedial measure, and I would follow the familiar maxim that remedial statutes are to be construed broadly to accomplish their purpose. In my view, it follows that general language of § 504 of the Rehabilitation Act prohibiting "discrimination under any program or activity receiving Federal financial assistance" applies broadly to employment discrimination. 29 U.S.C. § 794. The Rehabilitation Act therefore imposes a general requirement upon recipients of federal grants not to discriminate against employees.[3] As the legislative history of the 1974 Amendments to the Rehabilitation Act[4] explained, "Implementation of section 504 would . . . include pre-grant analysis of recipients to ensure that Federal Funds are not initially provided to those who discriminate against handicapped individuals." S.Rep. 93-1297, (1974) U.S.Code Cong. & Admin.News, pp. 6373, 6390-91.
 
 
 25
 As originally enacted in 1973, § 504 of the Rehabilitation Act simply prohibited handicap-based discrimination by recipients of federal grants. 29 U.S.C. § 794. The 1978 Amendments to the Rehabilitation Act added § 505 which provides that "remedies, procedures, and rights" available under Title VI of the Civil Rights Act of 1964[5] are also available to a "person aggrieved" by handicap-based discrimination of federal grant recipients. 29 U.S.C. § 794a(a)(2). See note 1 supra. The majority holds that § 505 of the Rehabilitation Act thereby incorporates § 604 of Title VI, 42 U.S.C. § 2000d-3, which provides:
 
 
 26
 Nothing in this subchapter shall be construed to authorize action under this subchapter by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal assistance is to provide employment.
 
 
 27
 However, § 604 of Title VI applies on its face only to agency action and says nothing at all about the remedies, procedures or rights available to persons aggrieved. Section 505 of the Rehabilitation Act refers to Title VI only insofar as it applies to "a person aggrieved." 29 U.S.C. § 794a(a)(2). Therefore the language of the Rehabilitation Act does not incorporate the language of § 604.[6]
 
 
 28
 Nevertheless, the majority suggests that § 604 should be interpreted to preclude most individual as well as agency actions challenging employment discrimination. This interpretation of Title VI seems correct to me, in view of the overall statutory scheme of the Civil Rights Act of 1964,[7] of which Title VI was a part. But this interpretation cannot be supported under the Rehabilitation Act.
 
 
 29
 In the Civil Rights Act of 1964, Congress simultaneously provided Title VI covering recipients of federal grants and Title VII[8] covering employers whether or not such employers are recipients of federal grants. Although it is not inconceivable that Congress would have provided overlapping remedies in the same statute, the overall statutory program would seem to suggest that Congress intended Title VII to be the main vehicle for combatting employment discrimination based on race, religion, sex or national origin.[9] This overall program would be furthered by the majority's interpretation of Title VI to cover employment discrimination only when the employee was an intended beneficiary of federal funds[10] or when the discrimination affected the intended beneficiaries of federal funds (as discrimination in employing teachers may affect students). See United States v. Jefferson County Board of Education, 372 F.2d 836, 881-86 (5th Cir. 1966), cert. denied, 389 U.S. 840, 88 S.Ct. 77, 19 L.Ed.2d 104 (1967). But see Cannon v. University of Chicago, 441 U.S. 677, 711-714 nn. 48-49, 99 S.Ct. 1946, 1964-1966 nn. 48, 49, 60 L.Ed.2d 560 (1979) (suggesting that restrictions on agency action under § 605 of Title VI may not apply to actions by individuals).
 
 
 30
 Even if § 604 is interpreted to restrict individual actions under Title VI, it does not follow that a similar restriction exists on individual actions under the Rehabilitation Act, which encompasses a different kind of statutory scheme than the Civil Rights Act of 1964. Congress did not in the Rehabilitation Act provide any general prohibition on handicap-based discrimination which would sweep as broadly as Title VII of the Civil Rights Act of 1964. Only handicap-based employment discrimination by the federal government is covered by provisions comparable to Title VII. 29 U.S.C. §§ 791, 794a(a)(1). As to handicap-based discrimination by private employers or state and local governments, coverage extends only on the basis of a contractual activity with or receipt of grants from the federal government. 29 U.S.C. §§ 793, 794, 794a(a)(2). Under this statutory scheme any coverage at all of handicap-based discrimination in employment depends upon the employer's status as a federal contractor or federal grantee. To hold that the statute would not cover most employment discrimination by federal grant recipients therefore means that the statute provides no remedy at all for many victims of handicap-based discrimination in employment. Therefore, even if § 604 were read into the Rehabilitation Act, the overall statutory scheme would not be furthered by extending § 604's literal restriction on agency action to restrict individual action.[11] In the Civil Rights Act of 1964, the restriction of individual actions under Title VI merely means that individuals must proceed under Title VII against employment discrimination based on race, national origin, or religion. Under the Rehabilitation Act, restriction of individual actions under § 794a(a)(2) would deny any remedy at all to many victims of discrimination.
 
 
 31
 Because the literal words of the statute do not require restricting the coverage of the Rehabilitation Act in this way, I would not do so in the absence of clear legislative intent. In any case, my reading of the legislative history of the Rehabilitation Act provisions in question suggests that Congress sought to expand, not limit, remedies available to victims of handicap-based discrimination. See Hart v. Alameda County Probation Department, 21 FEP Cases (BNA) 233, 238 (N.D.Cal.1979). As noted above, an express purpose of the Rehabilitation Act was to provide equal employment opportunities for handicapped individuals, 29 U.S.C. § 701 (1978).
 
 
 32
 Accordingly, I would hold that the Rehabilitation Act imposes a requirement that entities receiving federal grants refrain from discriminating against their employees on the basis of handicap.
 
 
 
 *
 The Honorable Donald P. Lay became Chief Judge of the Eighth Circuit on January 1, 1980
 
 
 [1]
 The district court found that a storekeeper must be capable of moving 55 gallon drums weighing approximately 450 pounds by utilizing a drum dolly, operating a fork lift truck, and lifting heavy, bulky objects alone or with the assistance of another, and that the heavier items in the storeroom weigh from 48 to 170 pounds
 
 
 [2]
 The district court found that the pre-employment physical examinations required of all prospective employees as the last step in the hiring process, are performed at Sutter Clinics, Inc., an independent establishment utilized by MSD on a fee-for-service basis
 
 
 [3]
 The rights, remedies and procedures of title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., were made available in section 794a(a)(1) to persons complaining of handicap discrimination in federal employment in violation of 29 U.S.C. § 791, section 501 of the Rehabilitation Act
 
 
 [4]
 During the debates on the Civil Rights Act of 1964, concern was expressed that title VI would permit government intervention into every aspect of the operations of the recipients of federal financial assistance. Representative Celler responded:
 This title simply provides that, where Federal money is used to support any program of activity . . . the program must be used for the benefit of both races, without discrimination.
 The bill would require that each Federal agency which extends financial assistance of the type covered by title VI must establish nondiscriminatory standards of general application.
 . . . It would, in short, assure the existing right to equal treatment in the enjoyment of federal funds.
 
 
 [110]
 Cong.Rec. 1518-19 (emphasis added)
 As to each assisted program or activity, title VI will require an identification of those persons whom Congress regarded as participants and beneficiaries, and in respect to whom the principle declared in title VI would apply.
 Id. at 1521 (emphasis added).
 See 110 Cong.Rec. 1542 (remarks of Rep. Lindsay); 110 Cong.Rec. 1602 (remarks of Rep. Mathias); 110 Cong.Rec. 2480-81 (remarks of Rep. Ryan); 110 Cong.Rec. 6545 (remarks of Sen. Humphrey); 110 Cong.Rec. 7060 (remarks of Sen. Pastore); 110 Cong.Rec. 13380 (letter from Deputy Atty. Gen. Nicholas DeB. Katzenbach to Rep. Celler).
 The language of section 2000d-3 was added to the bill to make it clear that discrimination in employment which does not affect intended beneficiaries of federal assistance is not within the reach of title VI. See United States v. Jefferson County Bd. of Educ., 372 F.2d 836, 882-83 (5th Cir. 1966), cert. denied, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967).
 
 
 [5]
 See (1974) U.S.Code Cong. & Admin.News pp. 6373, 6390-91
 
 
 [6]
 Section 794 was also modeled after section 901 of title IX, 20 U.S.C. § 1681. Id. Our interpretation here is consistent with recent decisions in which the language of section 901(a) of title IX, which is virtually identical to that of section 794, has been construed as covering only direct beneficiaries of federal funds. These cases have rejected HEW attempts to enforce regulations under title IX, which extend to the employment practices of recipients of federal assistance. See Junior College Dist. v. Califano, 597 F.2d 119 (8th Cir.), cert. denied, --- U.S. ----, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979); Islesboro School Comm. v. Califano, 593 F.2d 424 (1st Cir.), cert. denied, --- U.S. ----, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979); Romeo Community Schools v. HEW, 600 F.2d 581 (6th Cir.), cert. denied, --- U.S. ----, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979)
 
 
 [7]
 We also reject Carmi's contention that although MSD's funding was from EPA, HEW regulations on reasonable accommodation and pre-employment inquiries, 45 C.F.R. §§ 85.53, .55 (1979), are directly applicable to MSD. These sections, adopted in 1978, merely establish standards to be followed by each federal agency and department in promulgating its own regulation implementing section 794. See 45 C.F.R. § 85.4 (1979); Exec. Order No. 11914, 45 C.F.R. 400 (1979); see also 45 C.F.R. § 84.2 (1979). Moreover, they do not have retroactive applicability. See 43 Fed.Reg. 2132, 2133 (1978)
 
 
 [8]
 We note that Carmi's inability to demonstrate a property right sufficient to invoke procedural due process or the infringement of some other federally protected right, is fatal to any substantive due process claim. See Buhr v. Buffalo Public School Dist. No. 38, 509 F.2d 1196, 1202-03 (8th Cir. 1974)
 
 
 [9]
 Since the classification does not operate to disadvantage a suspect class or interfere with a fundamental right, the proper analysis is rationality rather than strict scrutiny. See Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976); Antonio v. Kirkpatrick, 579 F.2d 1147, 1148-49 (8th Cir. 1978)
 
 
 [10]
 Carmi does not contend MSD has a pattern or general practice of excluding handicapped persons from employment
 
 
 [1]
 Section 504 of the Rehabilitation Act of 1973 provides:
 No otherwise qualified handicapped individual in the United States . . . shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.
 Pub.L. 93-112, 87 Stat. 355, 394 (1973), codified as 29 U.S.C. § 794. In 1978, a new § 505 was added to provide in part:
 The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under (29 U.S.C. s) 794 . . .
 Pub.L. 95-602, 92 Stat. 2955, 2983 (1978), codified as 29 U.S.C. § 794a(a)(2).
 
 
 [2]
 An express purpose of the Rehabilitation Act of 1973 was to "expand employment opportunities in the public and private sectors for handicapped individuals," 29 U.S.C. § 701(8) (repealed 1978). The declaration of purpose was amended in 1978 to make it more concise. See H. R. Rep. No. 95-1149 at 41, (1978) U.S.Code Cong. & Admin.News, pp. 7312, 7352. See also H. R. Conf. Rep. No. 95-1780 at 101, (1978) U.S.Code Cong. & Admin.News, pp. 7375, 7412-13. Expansion of employment opportunities was one of eleven enumerated purposes in the 1973 Act; after the 1978 amendments the guarantee of equal opportunity generally was one of the specific aims of tHe act
 
 
 [3]
 The Environmental Protection Agency (from which appellee received its grant) prohibits grantees from discriminating against employees generally on the basis of race, sex, national origin and religion. See 40 C.F.R. § 30.410-(1) (1979) (requiring grantees to adhere to the requirements of Executive Order 11246, as amended, 40 C.F.R. part 8). Although the EPA does not seem to have issued regulations concerning handicap-based discrimination by grantees, I see no reason for assuming that EPA would adopt a more narrow approach than for discrimination by grantees on the basis of race, national origin or religion. See 29 U.S.C. § 794a(a)(2). Under the mandate of § 2 of Executive Order 11914 (1976), 45 C.F.R. at 399, 400 (1979) (implementing the Rehabilitation Act), EPA is required to issue regulations prohibiting handicap-based discrimination, consistent with regulations issued by the Department of Health, Education and Welfare. The HEW regulations generally cover employment discrimination by recipients of federal grants. 45 C.F.R. §§ 85.52-85.55 (1979). See note 6 infra
 
 
 [4]
 The Rehabilitation Act, as originally enacted in 1973, contained only a single section on federal grants, § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. See note 1 supra. The 1974 legislative history specifies that § 504 of the 1973 Act, 29 U.S.C. § 794, was modelled after § 601 of Title VI, not all of Title VI. S.Rep. No. 93-1297, (1974) U.S.Code Cong. & Admin.News, pp. 6373, 6390. It therefore does not indicate that § 604 of Title VI was incorporated into the Rehabilitation Act. (§ 604, not § 601, of Title VI restricts coverage of employment discrimination.) Although the language of § 504 is similar to § 601 of Title VI, 42 U.S.C. § 2000d, the 1973 Act contained no provision similar to § 604 of Title VI, 42 U.S.C. § 2000d-3
 In 1974, Congress amended parts of the 1973 Rehabilitation Act, but not § 504. Therefore, I do not regard the 1974 legislative history as determinative of the meaning of § 504 of the 1973 Act or, of course, § 505 of the 1978 Act. See Southeastern Community College v. Davis, supra, 442 U.S. at 411-12 n.11, 99 S.Ct. at 2369, 2370 n.11; Teamsters v. United States, 431 U.S. 324, 354 n.39, 97 S.Ct. 1843, 1864 n.39, 52 L.Ed.2d 396 (1977). However, both the majority and I give the 1974 legislative history some weight, although we disagree as to its significance. See at 674-675 and n.5.
 
 
 [5]
 42 U.S.C. § 2000d et seq
 
 
 [6]
 The legislative history of § 505 supports this conclusion. Section 505 was part of the 1978 Amendments to the Rehabilitation Act, and was taken from Senate Bill S. 2600, 95th Cong. 2d Sess. The Committee Report on S. 2600 explained,
 It is the committee's understanding that the regulations promulgated by the Department of Health, Education, and Welfare with respect to procedures, remedies, and rights under section 504 (29 U.S.C. § 794) conform with those promulgated under Title VI. Thus, this amendment codifies existing practice as a specific statutory requirement.
 S.Rep. No. 95-890 (1978) at 19. This report suggests that § 505 is consistent with HEW's regulations, which apply to employment practices generally of grant recipients. See 45 C.F.R. §§ 85.52-85.55 (1979). However, the Supreme Court, without mentioning this legislative history, has suggested that the HEW regulations may not be entitled to great deference because of delays in assertion of regulatory authority under the 1973 Act. Southeastern Community College v. Davis, supra, 442 U.S. at 411, 412 n.11, 99 S.Ct. at 2369, 2370 n.11.
 
 
 [7]
 Pub.L. 88-352, 78 Stat. 241 (1964)
 
 
 [8]
 42 U.S.C. § 2000e et seq
 
 
 [9]
 The EPA requires that grantees also follow the requirements of the federal contract compliance program prohibiting discrimination in employment on the basis of race, sex, religion, or national origin. See note 3 supra. It is unclear whether this regulation seeks to implement Title VI or rests on executive authority to prohibit discrimination. Cf. Contractors Ass'n v. Secretary of Labor, 442 F.2d 159, 166-71 (3d Cir.), cert. denied, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971) (affirmative action requirements for federal contractors under executive authority)
 
 
 [10]
 In my view, it is no simple question whether a particular employee is an intended beneficiary of federal funds for purposes of applying Title VI to employment. A public works program, for example, may have a number of purposes, including the purpose of increasing the overall amount of resources available to the recipient. By funding one necessary project, the public works program may be intended to free up for other uses resources that would have been set aside for that project. The intended beneficiaries of federal funds may well include employees other than those working directly on the federally assisted project. I therefore cannot agree with the majority's rather summary finding that appellant was not an intended beneficiary of the grants received by appellee. In my view, resolution of this threshold question would involve consideration of such factors as the legislative intent in establishing the grant program, and the specific facts surrounding a particular grant
 
 
 [11]
 As the majority points out, we have incorporated the restriction of § 604 of Title VI into Title IX of the Education Act Amendments of 1972, 20 U.S.C. § 1681 et seq. See at 675 n.6. We have accordingly restricted coverage of employment discrimination under Title IX. (Title VI prohibits discrimination based on race, national origin and religion, but not sex. Title IX was enacted in part to fill this gap in Title VI.)
 Paralleling language of Title VI, Title IX prohibits discrimination based on sex in educational programs receiving federal funds, but Title IX does not contain specific language restricting coverage of employment discrimination as § 604 of Title VI does. Nevertheless, courts have read into Title IX a restriction on coverage of employment discrimination, because Title IX was proposed as part of a single measure that contained other provisions extending coverage under other laws of employment discrimination based on sex. The overall statutory scheme of Title IX thus suggests that Congress intended for employment discrimination to be covered under other Acts, including Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Equal Pay Act of 1963, 29 U.S.C. §§ 206(d), 213(a). See Islesboro School Commission v. Califano, 593 F.2d 424, 426-29 (1st Cir.), cert. denied, --- U.S. ----, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979). We adopted the reasoning of that case in Junior College Dist. v. Califano, 597 F.2d 119, 121 (8th Cir.), cert. denied, --- U.S. ----, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979).
 By contrast, an express purpose of the Rehabilitation Act of 1973 was to "expand employment opportunities in the public and private sectors for handicapped individuals." 29 U.S.C. § 701(8). See note 2 supra. As enacted in 1973, the Rehabilitation Act, like Title IX, included language similar to Title VI, but did not include the restriction on coverage of employment discrimination. Unlike Title IX, however, the statutory program of the Rehabilitation Act did not include other provisions for combatting employment discrimination against the handicapped by recipients of federal grants. The reasoning of the Islesboro School Commission case therefore does not apply. On the contrary, the absence of a restriction on agency action suggests that Congress intended § 794 to cover employment.